TEXARKANA GAS & ELECTRIC LIGHT CO. *v.* ORR.

Opinion delivered June 9, 1894.

1.  *Appeal—Objection not raised below.*
    Objection cannot be taken on appeal for the first time that plain-
    tiff should have sued as administrator, instead of merely de-
    nominating himself administrator, or that he failed to show
    his official character by profert of his letters of administration.

2.  *Pleading—Amendment to conform to proof.*
    Where a complaint is ambiguous, it being uncertain whether it is
    an action under sec. 5223 of Mansf. Dig. for the benefit of
    deceased's estate, or under secs. 5225-6, *ib.*, for the benefit of
    his widow and next of kin, if the case was tried below as for
    the benefit of the estate, the complaint will, on appeal, be con-
    sidered as amended to conform to the proof.

3.  *Negligence—Live electric wires—Punitive damages.*
    Evidence that an electric light company knew in the night time
    that its wires were badly grounded, that its superintendent
    gave orders that the power should nevertheless be kept up,
    that after daylight, about 6 a. m., when many people were
    on the street, a live wire still lay on a street crossing by com-
    ing in contact with which a passerby was killed, is such
    evidence of wanton disregard of the rights and safety of others
    as will justify an assessment of punitive as well as actual
    damages.

4.  *Contributory negligence—Picking up live wire.*
    Whether a boy was guilty of contributory negligence in picking
    up a live wire lying across the street is a question for the jury
    where it showed no signs of being alive, though he had been
    warned, a few minutes before, against touching the wires.

Appeal from Miller Circuit Court.

RUFUS D. HEARN, Judge.

STATEMENT BY THE COURT.

This suit was instituted by appellee, administrator
of the estate of Ed. Wallace, deceased, against the ap-
pellant company, in the Miller circuit court, at its No-
vember term, 1891, and the cause was tried at the
November term 1892, resulting in a verdict and judg-

ment for plaintiff in the sum of $20 actual damages and
$200 punitive damages against the defendant.

### ABSTRACT.

The cause of action is fully set forth in the com-
plaint, which is as follows, to-wit : "Comes the plain-
tiff, Thos. Orr, administrator of the estate of Edward
Wallace, deceased, and, complaining of the defendant,
the Texarkana Gas & Electric Light Company, a cor-
poration existing under and by virtue of the laws of the
State of ·Arkansas, states that on the 23d day of Au-
gust, 1891, defendant owned, maintained and operated in
the city of Texarkana, Arkansas, a system of electric
lights, and that, by means of wires, the electric current
was carried over, upon and along the streets of Texarkana,
Arkansas—from the power house to the various points of
service in said city ; that, during the night of the 22d of
August, 1891, or early on the morning of the 23d of Au-
gust, 1891, said company's wires became disabled and out
of repair, and, being either broken or disengaged from
their fastenings, fell to the ground upon the sidewalk
and crossing in the city of Texarkana at the intersec-
tion of Broad street and Pine street in said city, and
said defendant negligently permitted said wire to re-
main so grounded and lying upon said street crossing
from about 12:30 o'clock a. m. until after daylight in the
morning, when said street was thronged with passers-by ;
that the ·deceased, Edward Wallace, while passing
along said street about or a little after daylight, had
his attention called to said obstruction lying upon said
crossing, and being ignorant of the character of said
wire, and presuming, and having a right to presume,
that defendant would not permit a live wire to re-
main under the feet of passers-by upon so crowded a
thoroughfare, took hold of same to cast it aside out of
the way of pedestrians, and was killed by the powerful

current with which said wire was at the time charged. And plaintiff alleges that deceased came to his death by the gross negligence and wanton misconduct of defendant, its agents and employees, and that deceased came to his death without fault on his part, and to the damage of his estate in the sum of twenty thousand dollars. Wherefore plaintiff prays damages in the sum of twenty thousand dollars, and his cost in and about this cause expended."

The answer is substantially a denial of all the material allegations in the complaint.

The evidence in the case is to the effect that, during the night of the 22d day of August 1891, there was an electrical storm in Texarkana, such as was never known in that locality before that time; that at that time the appellant corporation was operating its lamps and wires in that city for the purpose of furnishing lights to its inhabitants; that there was more or less of inexperience in the persons immediately in charge of the operation of the machinery at the "power house;" that there was an apparent want of that extra care and watchfulness on the part of those in control, which the peculiar circumstances seem to have demanded; and that, by reason of the terrific character of the storm, and its effect upon the machinery and wires, there was considerable demoralization among the employees then on duty.

The testimony goes to show that some of the wires were broken and down between 12 o'clock and 2:30 o'clock a. m. of the night in question, while some of the testimony would seem to point to a later hour. At all events no discovery of a "ground" seems to have been made at the "power house" earlier than about 2 o'clock a. m. "By 'ground' is meant any connection between the line and the earth. This connection may be made by the line, or any of its connections, being broken, and the ends coming in contact with a tree or its limbs, or with the

pole or roof of a house, or by another wire or rope or string being thrown over the line and resting on the earth. To cause ground by the wire coming in contact with the pole or a tree or the roof of a house, there must be damp. "It was shown by the testimony of experts that it is scarcely possible to ascertain the locality of a "ground" by the application of the most efficient tests, but that these tests are available to ascertain the fact that there is a "ground," and, to some extent, the nature of the "ground."

There is no complaint that proper tests were not applied on the occasion of the storm in question. In fact the object of the application seems to have been attained by the person in charge of the machinery at the "power house," for we find one witness (who seems to have been in a position to testify directly on the subject) testifying as follows: John Thurston testified: "I was at the electric plant at work, carrying in strips to fire with, when Ed. Wallace was killed. Mr. Gafney, the engineer that night, sent me to the hotel to notify the superintendent that the alternating incandescent machine was badly grounded. I went and told him— Mr. Randall. The superintendent told me to go ahead. He asked me what the trouble was, and I told him as stated, and he asked me what time it was, and I replied, I did not know, and then he told me to go back and tell them to go ahead. I went back, and told Mr. Gafney. I went to work for the Electric Light Company on the 14th of June, I believe, and this thing happened in August, I think. That was a very bad night. We were all badly scared up."

The evidence discloses to us the fact that, while the locality of a "ground" cannot be ascertained by the application of tests at the "power-house," and also that the storm was raging so furiously, and the night was so unfavorable that it may have been asking too much of

the employees of the company to hunt up those broken wires until daylight, yet we are informed by the testimony in the case that the accident resulting in the death of plaintiff's intestate occurred some hours after daylight, and at a time when peopie had begun to appear upon the streets of the city.

Concerning events immediately connected with the accident, it is said in testimony that it was during the thunderstorm, about 5:30 o'clock in the morning, that Ed. Wallace came into the saloon where witness was working, the "Triangle Saloon" just across the street from Smith's drug store. This was about ten minutes before he was killed, and the witness, Jesse Cole, spoke to him about catching hold of the wires that were connected with the main wire and that ran into the saloon. He then had hold of a dead wire, and witness then told him to be careful of those wires. While deceased was at this point, a short time afterwards, a hog had come in contact with live wires on the opposite side of the street, and made demonstrations of having received a shock from them, but whether deceased saw this or not witness could not say, further than that he was in a position to have seen it, and witness believed he did, as they were standing together on the sidewalk, in full view. From this point, deceased went across the street to Smith's drug store, and when about midway the street—near the street-car line—he picked up a broken wire that ran into the saloon he had just left, and dragged it along towards Smith's corner, when he was ordered by a policeman to put down the wire. In apparent obedience to this order, he threw the wire—"flipping" it as one said, "flopping," as another said—and as it went over (his head), he "hollered" out, and took hold of the wire with both hands, and fell dead almost immediately. It would appear that, in throwing the wire from him, it had crossed, forming a circuit, and

thus the current was created. He was then near the Smith sidewalk. From the following language of the witness, it would seem that the crossing of the wire spoken of was the crossing of the dead wire with a live wire that chanced to be at that point, to-wit: ''Deceased was not injured by taking hold of the wire in the street, and he was throwing this wire off the street. I knew at the time the other wire was alive, as it had shocked a hog that got tangled up in it. No life was noticable in these wires before they were crossed.'' The evidence shows that the struggles of deceased were of the briefest character. He cried out twice, and his hands were burnt and drawn by the wires. He died almost instantaneously.

The evidence does not give the age of the deceased, but we infer, from the language used with reference to him, that he was a boy not yet arrived at the age of manhood ; and from his actions, as detailed by the witnesses, he appears to have been of that indiscreet age which is between the irresponsibility of youth and the full responsibility of manhood. He appears to have been at an age when it might fairly be left to the jury to say how far he should be held responsible in any given state of case.

*Scott & Jones* for appellant.

1. Plaintiff sues as Thomas Orr, administrator, and not *as* administrator. His representative capacity is not alleged, nor is *profert* made of his letters. The defect was not healed by the testimony. 25 Ark. 7 ; 54 *id.* 525.

2. The evidence shows the intestate guilty of contributory negligence. 11 East, 60 ; 55 Ark. 213.

3. It was error to award exemplary damages. There was no *malice, wilfulness* or *conscious* indifference to consequences. 53 Ark. 7.

4. No negligence was shown. The accident resulted from the "act of God," the wires being broken by lightning. The company was bound to reasonable care only, and could be held responsible for an injury from the breaking of wires, only by proof of culpable negligence. 71 N. Y. 81; 27 Am. Rep. 10.

5. The judgment should be reversed, and the cause dismissed. 57 Ark. 461.

*J. D. Cook* for appellee.

1. There is ample proof of culpable negligence. For over six hours defendant knew its wires were heavily grounded in a populous city, and made no effort at all to repair the line or prevent injury. Its indifference and carelessness was wanton, and called for *punishment* by exemplary damages.

2. Whatever defects there may have been in the pleadings, they were not objected to. It is too late now. 25 Ark. 7; 13 *id.* 419; 11 *id.* 664; 8 *id.* 314.

BUNN, C. J. (after stating the facts). The objections that plaintiff should have sued *as* administrator, instead of merely denominating himself *the* administrator of deceased, and also that he failed to show his official character by a proper profert of his letters of administration, should have been made and insisted on by way of motion, at an earlier stage of the proceedings, and are not available now. <sub>1. When objections not raised on appeal.</sub>

At common law, no action lay for the death of a person, produced by the negligence or wrongful act of another. Now, by statute, (sections 5225 and 5226 Mansfield's Digest) an action lies for damages growing out of the death, at the instance of the administrator, for the benefit of the widow and next of kin, and, in the absence of an administrator, at the instance of the heirs at law, for the same purpose. The suit authorized by these two sections is not for the benefit of the estate of deceased. <sub>2. When pleading amended to conform to proof.</sub>

The proceeds do not go into the hands of the legal representative, to be distributed to creditors and heirs and others entitled under the statute of administration, but to be distributed to the widow and next of kin "in the proportion provided by law in relation to the distribution of personal property left by persons dying intestate ;" and the damages are to be such as the jury in each case "may deem a fair and just compensation, with reference to pecuniary injuries resulting from such death, to the wife and next of kin of such deceased person."

Again, a suit for damages to person or property, which might be brought by the injured person, did not, at common law, survive to his legal representative, and if it had been instituted by the deceased in his life time, it abated at his death. Now, by statute, however, (section 5223 Mansfield's Digest) an "action may be maintained against the wrong doers, and such action may be brought by the person injured, or, after his death, by his executor or administrator, against such wrong doer, or after his death (that of the wrong doer), against his executor or administrator, in the same manner and with like effect in all respects as actions founded on contracts."

In construing these several statutes together, (for they bear some relation to one another), this court, in the case of *Davis* v. *Railway*, 53 Ark. 117, said : " The right of action, given by the latter statute (sections 5225 and 5226, Lord Campbell's act) to the personal representative of one whose death has been caused by the default of another, is created by the statute, and is not a continuation of the right of action which the deceased had in his life time.    *    *    *    *    *    *    * The right which accrued to the deceased survives to his administrator by virtue of the former statute (section 5223, Mansfield's Digest); the newly created right (by section 5225) results from, and accrues on, the death of

the injured party.   Both actions are prosecuted in the name of the personal representative, where there is one, and may proceed *pari passu*, without a recovery in the one having the effect of barring a recovery in the other, because the suits are prosecuted in different rights, and the damages are given upon different principles to compensate different injuries.   One is for the loss sustained by the estate and for the suffering from the personal injury in the life time of the decedent, the recovery of which goes to the benefit of the decedent's creditors, if there are any ; the other takes no account of the wrongs done to the decedent, but is for the pecuniary loss to the (widow and) next of kin, occasioned by the death alone. The death is the end of the period in the one case, and the beginning in the other.   In the one case the administrator sues as legal representative of the estate, for what belonged to the deceased ; in the other, he acts as trustee for those upon whom the act confers the right of recovery for the pecuniary loss inflicted upon them."

The suit at bar must be regarded as an action by the plaintiff as administrator for the benefit of the estate of the deceased ; and, viewing it as such, the complaint, which lays its damages for the death of the deceased, would be bad on demurrer ; for damages for the death of decedent, when recovered, are no part of the assets of the estate, to be distributed to creditors and so forth.   But as no demurrer was interposed, and since the manner of eliciting the testimony, the language of the instructions, the argument of counsel, and the verdict of the jury and judgment of the court, all go to show that the parties, the jury and the court all treated the claim of the plaintiff as one for the injury to deceased in his life time—that is to say, for the pain and suffering he endured from the moment he was stricken until the moment of his death—which was legitimate—

we will also treat the case in that way, and consider the complaint as amended to correspond with the proof.

**3. Negligence held to justify punitive damages.** The court is of the opinion that the evidence of negligence on the part of the defendant company, and its servants and employees, is sufficient to authorize the verdict of the jury, and that the evidence as to pain and suffering is sufficient to justify the verdict for actual damages; and a majority is of the opinion that there is evidence of wanton disregard of the rights and safety of others on the part of the defendant's employees, upon which the jury may have assessed punitive damages, as they did.

**4. Question of contributory negligence is for jury, when.** As to the defense of contributory negligence, a majority of the court is of the opinion that, whether or not the conduct of deceased in handling the broken wires was careless somewhat depends upon the object he had in so doing, and also upon his knowledge or ignorance of all the elements of danger connected therewith, and that the jury may have found from the evidence that he was not guilty of contributory negligence, notwithstanding the warnings that were given him.

Thus, having in view the prerogative of the jury, we do not feel justified in disturbing their verdict.

The instructions of the court, as given, when taken all together, we think fairly and substantially declared the law to the jury.

The judgment is therefore affirmed.