## Lexington Utilities Company v. Parker's Administrator.

(Decided October 7, 1915.)

### Appeal from Fayette Circuit Court.

1. Negligence—Proximate Cause of Accident.—Where appellant's wire carried a high current of electricity, and appellant had notice for 20 minutes that the wire was broken and hanging in a dangerous place, its failure to shut off the current was the proximate cause of the accident.

2. Negligence—Contributory Negligence—Question for Jury.—It was a question for the jury whether Parker's conduct in crossing the street to the vicinity of the broken wires was contributory negligence on his part.

3. Electricity—Extent of Care in Respect to Use of.—The law imposes upon those owning and operating wires charged with high current of electricity, duty to use the utmost care in respect to it. Others are required to use ordinary care for their own safety, commensurate with the danger.

4. Damages—Measure of Damages.—The court did not err in refusing to instruct the jury as to the measure of damages, that they should take into consideration the sums Parker might reasonably have been expected to expend upon himself for his proper maintenance and support.

SHELBY, NORTHCUTT & SHELBY, ALLEN & DUNCAN and STOLL & BUSH for appellant.

ROBT. B. FRANKLIN and ROBT. C. TALBOTT for appellee.

OPINION OF THE COURT BY JUDGE NUNN.—Affirming.

On October 12th, 1912, John B. Parker was killed on Third street in Lexington, by coming in contact with a live electric wire which was broken and hanging down nearly to the ground. This wire was hanging from a pole on the south side of Third street, in front of Mrs. Corrigan's house, and just opposite to where Wilgus avenue intersects Third street from the north. The wire was

used and owned by the appellant for conducting electric current through and over the streets of Lexington. Parker's administratrix sued and recovered a verdict and judgment against appellant for $11,000, and from that judgment this appeal is prosecuted.

The pole in question was about 50 feet high, and the cross-arms on the upper part carried the wires of the Home Telephone Company. Lower down on the pole, and about 30 feet from the sidewalk, there was a cross-arm which carried four wires for the appellant light company. This pole was new, and was set the day before by employees of the telephone company about three feet east of the old one, which had become decayed and unfit for further service. Late in the afternoon, and after transferring the telephone wires to the new pole, the light company was notified that the pole was ready, and their employees came at once and transferred the electric wires. This transfer did not embrace any cutting of the wires. The fastenings to the insulators on the pegs of the old cross-arm were released and the wires fastened to insulators of a cross-arm on the new pole. There is no evidence that the workmen or anyone for the light company inspected these wires, except at the pole, and no slack was taken up. In fact, the only thing done was to release the wires from the old pole and attach them to the new.

The action was brought against the light company and the telephone company jointly, but, at the conclusion of the evidence, the telephone company was released by a directed verdict, and about which no complaint is made.

As already stated, four electric light wires were carried along this street. The two inside wires, that is, the ones next to and on each side of the pole, were called the arc light wires, and those on the outside, that is, at each end of the cross-arm, were known as the primary wires. The arc light wires were supposed to carry a current at night only, and then of. only 550 volts. These wires supplied current for the street lights. The primary wires, or, at least, the one next to the street, carried a constant current of 4,000 volts, and they were used for domestic or incandescent lights and industrial purposes. The insulators to which the wires were attached were 12 inches apart. The pole was set at the sidewalk curbing, so that half the cross-arm projected over the sidewalk and the other half over the street or gutter. The arc and primary wires strung over the street, were the two broken wires.

When broken they reached to within 6 or 12 inches of the ground. There were two trees between this pole and the one next east, and the wires were strung through these tree tops. For a year before the accident, and up to within two months of the time of it, the neighbors repeatedly saw these wires arcing in the tree tops, that is, a light would flash, or, as described by one witness, "it would sparkle like a bunch of shooting crackers at the time, but, of course, would not do it all the time." This was proof of a bad condition—either poor insulation, or the wearing of it by coming in contact with the tree tops, or grounding or crossing of the wires, together with poor inspection. One witness who noticed this says that about two months before the accident, "I notified the company to come out and attend to the matter." She gave this notice by telephone. The company does not admit receipt of the notice, but no witness disputed the wire conditions described, over this long period of time. There is no pretense that anything was ever done to correct the trouble.

The accident occurred at 7:05 in the morning. All during the night there had been a high wind storm, although very little rain. Mrs. Corrigan testifies that between five and six o'clock that morning she "heard an awful noise, it was an awful wind that morning * * * but I heard the noise there about six o'clock, and the noise got so bad I went to the door to see and the wires were tingling; * * * they were loose like, hanging down from the pole; * * * they had not broken at that time. * * * I went back in the house, stayed back in there some time, and it made so much noise when the wire broke, this wire broke it just made a noise like a motor cycle. I didn't go to the door at the time but my little girl did and she called me and I saw that the wire had broke, and I was so afraid that some children would come along and touch the wire, I stayed and watched it."

The break occurred at about 6:30 or 6:40 o'clock. Three witnesses testified that, by telephone, they immediately notified the light company of the broken wire and of the presence of children. The light company admits receiving one of these notices at 6:45. The company explains that the repair men did not usually come on duty until seven o'clock, but by 6:55 or seven o'clock the crew started to the place to take up the wire and reached there at 7:15, or, as other witnesses fixed the time, by 7:30.

Anyhow Parker was dead when they reached there, having been killed at 7:05.

Parker was employed and on night duty as a car inspector for the Chesapeake & Ohio Railroad. He was on the way home after his night work, and walking on the north side of Third street, that is, across the street from the broken wire. His attention was arrested, and he stopped and went over. One of the children says that "Mrs. Corrigan told me to watch there while she got breakfast for her and Mr. Corrigan, and Mr. Parker came along and he was on the far side of the street, and he came across and stooped over and was telling us what a dangerous wire it was, and the wind blew the wire up against him, and must have caught in his hands, and he pushed it away and it must have caught in his hands." Parker instantly fell dead with the end of the wire, uninsulated, clutched in his hand, or, at least, that was the condition as he lay there in the street. Another witness says that Parker inquired "what is the matter over there, and I said, there is a live wire down." Another child testifies that, "when he got across the street he stooped over one of the wires with his hands on his knees and said to me 'This wire is liable to be dead,' and I said 'I don't know, I am not going to bother it,' then I told him not to bother it and he said all right     *     *     *     As he was stooping over the wire, the wire blew up to him and as he went to push it back and slapped it in his hand and it knocked him over against the curb and he fell." These witnesses evidently referred to the swinging wire as the wire that "blew up," and the wire on the ground as the one over which Parker had stooped. After the break, only two of the wires were alive, that is, the ones hanging down from the pole, as only those ends were then in connection with the power house. The other ends were lying on the sidewalk or street in loops. There is a conflict in the evidence as to how far apart were the ends of the severed wires, and counsel do not agree as to which wire Parker was stooped over and looking at, that is, as to whether the wire he was stooped over was the wire which blew up against him. Perhaps the expressions used by the witnesses in connection with a model made it clear to the jury as to what wires they referred to, but from the record we can not know about these matters with certainty. We think it clear that it was one of the loose swinging wires that blew over against him, for they only

carried the current at that time. As we understand the evidence, he was stooped over, looking at one of the loose ends coiled on the street, and just as he was raising up to step onto the sidewalk one of the hanging ends blew against his breast. As this end when hanging straight nearly touched the ground, and it struck him breast high, the arc described by its swing shows that he was standing at least 5 or 6 feet from where it would hang in its normal position.

Several errors are urged as grounds for reversal and we will take these up in order presented by appellant.

The first is that there is not sufficient evidence of negligence on the part of the light company to sustain the verdict. It is conclusively shown that the light company had notice of the break 20 minutes before the accident. With knowledge of this fact, there was negligence in failing to shut the current off from the wire. Knowledge of the break imposed upon the light company the duty of refraining from sending a current through the wire until it ascertained that it was safe to do so. Joyce on Electric Law, section 454.

The proof also shows that the wires at this point were in a defective condition for at least a year, and that the company had notice of the fact. The proof on either of these propositions is sufficient to take the case to the jury on the question of appellant's negligence. Appellant insists that the court should have peremptorily instructed the jury to find for it, for the reason that, even if evidence of its negligence is sufficient, still, its negligence was not the proximate cause of the accident. It is argued that whether Parker's act in crossing the street and voluntarily placing himself dangerously near a live wire was negligence on his part or not, still it was an independent voluntary act which intervened subsequently, and but for which intervention the accident would not have occurred. On this proposition, we think, Cooley in his work on torts, page 76, 3rd Ed., states the rule correctly:

"If the original act was wrongful, and would naturally, according to the ordinary course of things, prove injurious to some other person or persons, and does actually result in injury through the intervention of such other causes which are not wrongful, the injury shall be referred to the wrongful cause, passing by those which were innocent."

Of course his action was voluntary, but it is a question—one for the jury—whether he voluntarily placed himself dangerously near to a live wire, and whether he knew, or by the exercise of ordinary care, could have known of the danger. While there was proof that the loose wire was swayed by gusts of wind, yet there is no proof that he had seen that wire. He went across the street and immediately stooped over the dead wire which was coiled on the street. He did not know whether it was a live or a dead wire, but was evidently cautioning the children about it. It is not clear from the record how far he was standing from the loose ends at the pole. His conduct was "instinctive and innocent," again using the language of Mr. Cooley—at least, the evidence warranted the jury in so concluding—and was a circumstance so conjoined with appellant's negligence as to naturally produce the injury, and appellant should have anticipated the circumstance.

"The mere fact that a person or his property is in an improper position, when, if he had not been there, no damage would have been done to him, does not preclude him from recovering. Such circumstance is only a condition to the happening of the damage, not a cause of it." Bigelow on Torts, page 180; Beiser v. C., N. O. & T. P. Ry. Co., 152 Ky., 522; Mich. City Gas & Electric Co. v. Ditke, 100 N. E., 877.

Appellant contends that the court should have given a peremptory instruction on the ground that decedent's own negligent conduct contributed to and caused his injuries. From what has already been said, it will be seen that, in our opinion, this was a question for the jury, and the court did submit the question under proper instructions. On the question of liability, the court gave the following instructions:

"1. The court instructs the jury that it was the duty of the defendant, the Lexington Utilities Company, to use and exercise the utmost care and skill in the construction, management and maintenance of its wires which carried a current of electricity at the place where the decedent, John B. Parker, was killed, and it was also the duty of said company to exercise and use the utmost care and skill to properly protect and support said wires, and to inspect and keep the same in repair and to exercise and use the utmost care and skill not to permit said wires to become or remain in unsafe proximity with each other, or

to become so defective as to cause them to break or fall upon the street over which said wires were suspended, or to permit them to remain charged with a current of electricity while fallen upon or near said street or sidewalk; and if the jury believe from the evidence that the defendant, the said Lexington Utilities Company, failed to observe said duties or any of them, and that because of such failure on the part of said company, if any, the said wires were broken and fell upon or near the street where the said decedent was, and that because of said failure, if any, the said wires came in contact with and shocked and killed the decedent while in or upon said street or sidewalk, then the jury shall find for the plaintiff, unless they find for the defendant under instruction No. 3.

"2.   Unless the jury believe from the evidence that the defendant, Lexington Utilities Company, failed to exercise the utmost care and skill in the construction and maintenance of said wires, or in properly insulating and supporting said wires, or inspecting or keeping in repair the same, or in permitting said wires to become in unsafe proximity to each other, or to become so defective as to cause them to break and fall upon said street, as defined in instruction No. 1; and unless the said decedent, John B. Parker, was shocked and killed by reason of such failure on the part of the defendant, then the jury should find for the defendant.

"3.   It was the duty of the decedent, Parker, to exercise ordinary care for his own safety, and if the jury believe from the evidence that upon the occasion referred to in the evidence said Parker knew, or had reasonable grounds to believe, that the wire that killed him was charged with a dangerous current of electricity, and if they further believe that he failed to exercise ordinary care in approaching or passing the said wire and that by reason of such failure to exercise such care, if he did so fail, he came in contact with said wire and was killed, the jury should find for the defendant, even if they believe there was a failure on the part of the defendant, as defined in instruction No. 1.

"4.   By utmost care and skill, as used in these instructions, is meant the highest degree of care and skill known, which may be used under the same or similar circumstances.

"By ordinary care, as used in these instructions, is meant such care as an ordinarily prudent person would exercise under like.or similar circumstances."

By the instructions the court imposed upon appellant the duty to exercise the *utmost* care in respect to maintenance of its wires, etc., while the defendant was only required to exercise *ordinary* care for his own safety. Appellant complains that by this distinction the impression was made upon the jury that less care is required of an individual for his own safety than is required of another with reference to it. In the first place we may say that the care exacted of Parker was "such care as an ordinarily prudent person would exercise under like or similar circumstances." In other words, a degree of care commensurate with the peril. The utmost or highest degree of care and skill which might be used under similar circumstances is the standard of duty imposed upon those owning or operating heavily charged electric wires. Instructions so fixing these relative duties have been frequently approved by this court. Bowling Green Gas & Light Co. v. Dean's Ex., 142 Ky., 678, 134 S. W., 1115. Union Power Co. v. Young's Admr., 141 Ky., 805, 133 S. W., 991; Mangan's Admr. v. Louisville Electric Light Co., 122 Ky., 476, 29 Rep., 38, 91 S. W., 703, 6 L. R. A. (N. S.), 459; McLaughlin v. Louisville Electric Light Co., 100 Ky., 173, 18 Rep., 693, 37 S. W., 851, 34 L. R. A., 812.

Appellant criticizes instruction No. 3, in that it limits the duty of Parker to the exercise of ordinary care "in approaching or passing the wire." The argument is made that since he had stopped at the time he was killed, he was neither passing nor approaching. The instruction offered by appellant on this proposition imposed upon Parker the duty to exercise ordinary care while "in the vicinity of the wire." To have incorporated this idea in the instruction would not have been objectionable, but we do not believe there was prejudicial error in failing to do so. Instruction No. 3 made it plain to the jury that it was the duty of Parker to exercise ordinary care for his own safety at the time in question, and that was the issue.

Instructions No. 5 which the court gave on the measure or damage is as follows:

"5. If the jury find for the plaintiff they will find for her in such sum as will fairly and reasonably compensate the estate of the decedent for the loss of decedent's power to earn money, not exceeding, however,

the sum of thirty-five thousand ($35,000.00) dollars, the amount claimed in the petition, and in arriving at the amount of damage, if any, they may consider his age, state of health, earning capacity, the occupation in which he was engaged, and the probable duration of his life."

Appellant insists that the court erred in refusing to permit the jury to take into consideration, "the sums that said Parker might reasonably have been expected to expend upon himself for his proper maintenance and support." It is sufficient to say that the instruction is substantially the standard form many times approved by this court, and we are unwilling to make a departure from the procedure established. C. & O. R. Co. v. Lang's Admr., 100 Ky., 221; Louisville & Nashville R. Co. v. Milet's Admr., 20 Ky. L. R., 532; C. & O. R. Co. v. Kelly's Admr., 160 Ky.; 296.

On the whole case, we are of opinion that the judgment should be affirmed, and it is so ordered.