## Kentucky & West Virginia Power Company v. Ferguson's Administrator.

(Decided June 22, 1934.)

(As Modified on Denial of Rehearing Dec. 21, 1934.)

JOHN M. THEOBALD and ARTHUR T. BRYSON for appellant.

JAMES CLAY, R. C. LITTLETON and FIELDS, LEWIS & FIELDS for appellee.

OPINION OF THE COURT BY DRURY, COMMISSIONER— Reversing.

The Kentucky & West Virginia Power Company has appealed from a $5,000 judgment recovered against it by Leonard Ferguson's administrator, for the alleged negligent killing of his intestate.

## The Facts.

On September 19, 1932, the power company had a rather extensive system of electric lines in Ohio, West Virginia, and Northeastern Kentucky, and for some six months or more had had a branch line near Lawton, in Carter county. This branch line was about one and one-half miles long, carrying 6,600 volts of electricity to its customers, the Tygart Limestone Company, the Green Bag Cement Company, and the Tavern Rock Sand Company. For a part of the way this line was built through a forest, and when defendant cleared off its right of way it threw the brush to one side, and such dry brush was lying there on the day mentioned. A portion of this forest belonged to Eliza Stegall, and her husband on that day was cutting some of the timber in this forest, with a view to building a home. This was a rather thickly timbered piece of land. Mr. Stegall testifies the place the boy was killed was 60 feet from the road leading up to the sand plant. Mrs. Ferguson was on that road, and she testified she could not see the boy. Where one cannot see 60 feet, it needs must be quite a thicket. This was a triple-phase line, and consisted of three wires erected on 40-foot poles. In cutting this timber Stegall endeavored to so cut it as to have it fall away from the line, but at 2 p. m. on this day it chanced that a tree, cut by Stegall, fell against this line and broke two of these wires. Stegall went to the office of

the Tavern Rock Sand Company and had Mr. Saulsberry call up the power company and report that he had cut a tree and it had fallen on the line. Just whom Saulsberry talked to other than the telephone operator nowhere appears. The telephone operator says all she learned was that some one wanted to report a case of trouble; that there was a tree on a wire at the Tavern Rock Sand Company's plant, and she connected him with the merchandise department. The line foreman of the power company testified some one called him shortly after 2 o'clock and told him some one had cut a tree at the Tavern Rock Sand Company and it had fallen on the line. He did not know who this was, but said it was a woman's voice. In 15 minutes he started a crew of men out to find and correct the trouble. In the meantime Stegall, the man who had brought this situation about, returned to his timber cutting. A few minutes before 4 o'clock Leonard Ferguson, a 14 year old boy, who wanted to see Mr. Stegall, was making his way through this ticket to find him and was guided by the sound of his chopping. These two broken wires were lying on the brush and briars, and it appears the boy got hold of them and was electrocuted, and it is for that this suit was brought.

The boy's death is most unfortunate, but was purely accidental, and to fix responsibility therefor on the power company it must be shown its negligence had in some way brought it about.

### Was it Negligent?

This tree fell at approximately 2 o'clock. Previous thereto this line was functioning safely and normally. The falling of the tree created a new situation, and as soon as the power company learned of that, and in direct ratio to what it learned, or in the exercise of proper care should have learned, new duties fell upon it, and its liability, if any, must be found in some neglect of those new duties. It must act promptly and must anticipate all those occurrences which a person of ordinary prudence, in the light of the knowledge it had, would have anticipated. It knew this happened in the woods; there was no occasion for it to anticipate the presence of persons thereabouts, other than the one or ones who had caused it, and hence knew all about it. It was under obligation not to interrupt the services of its customers by cutting off the current, unless it knew its wires were

down at a place where people were likely to be, and it did not. Therefore it was not required, under the knowledge it had, to cut off the current, as the company was in Lexington Utilities Co. v. Parker, 166 Ky. 81, 178 S. W. 1173, where it was held that in view of what that company knew it should have cut off the current.

## Cutting Off the Current.

The crew that was sent out to repair this line stopped at Lawton and by opening the switch there cut off the current on this branch line. The proof shows there were five other places along this 33,000-volt line which this crew passed whereat there were switches which this crew could have opened and de-energized this line. The boy was killed about five minutes before the switch at Lawton was opened. The opening of any of the others would have saved the boy's life. The failure to open some of these other switches is alleged to be negligence. The answer to that depends upon what the power company knew or should have known. From this evidence we feel it can be said the power company knew its wires had been broken and perhaps it should have anticipated that dangling ends of them might be near enough to the ground that they were within reach, but why should it anticipate the presence of persons thereabouts ignorant of the situation and the danger?

The power company knew it had thousands and thousands of customers who used its service for power in their various plants and mills and for comfort and convenience in their homes and it must keep in mind the danger, loss, and inconvenience that would result to them by such an interruption, yet in spite of that if it had known for certain of this boy's peril or should have reasonably anticipated such, it should have opened the first available switch. This did not happen on a street, on a playground, or at a ball park; it happened in the woods. Saulsberry testifies that in his telephone conversation in which he reported the matter, he did not tell them what effect it had on the wire, but that a tree had fallen across the line and it was just east of the property of his company, and that his power was off and the line foreman of the power company, to whom this information ultimately came, knew that was in the woods. This woods adjoined a highway and the railroad and was inclosed by a wire fence, yet was occasionally used by parties passing through as is evidenced

by a path about 20 feet from where the boy was killed. With no more information than that, the power company had no cause to anticipate the presence of persons thereabouts other than those who had caused it, and knew all about it, and it was not negligent when it failed to turn off the current at the first switch.

In Kentucky Utilities Co. v. Woodrum's Adm'r, 224 Ky. 33, 5 S. W. (2d) 283, 288, 57 A. L. R. 1054, we held that company was not negligent in replacing a switch and sending the current through its lines again because as we said in that opinion:

> "There is nothing in the evidence * * * to show that the company should have forseen the probable injury and death to the Woodrums when Sandidge reclosed the switch."

This case is simply the Woodrum Case turned around, and we are unable from this evidence to find that the power company should have forseen that any person would be out in this woods except those who knew all about it and would of course keep out of the way of the wires. Even though the highest degre of care is demanded, still the one from whom it is due is bound to guard only against those occurrences which can reasonably be anticipated. The power company owed a duty to its patrons to maintain their service uninterrupted, but it also owed a duty to the public to interrupt that service to protect a member of the public from any danger a reasonably prudent man would anticipate, but we conclude that the danger which eventuated in this case was not such as a reasonably prudent man would have anticipated. If any switch was to be opened, it should have been the first one available; but we cannot say it was negligence in this case not to open a switch after saying it was not negligence in the Woodrum Case to close one.

Negligence is not determined by what we look back after an occurrence and see might have been done, but by what a reasonably prudent man would have done before the event.

There is no great abundance of cases wherein the question of cutting off an electric current is involved, but we have found these all involving wires in public streets: Lexington Utilities Co. v. Parker, 166 Ky. 81, 178 S. W. 1173; Texarkana G. & E. L. Co. v. Orr, 59 Ark. 215, 27 S. W. 66, 43 Am. St. Rep. 30; Mayor, etc.,

of Madison v. Thomas, 130 Ga. 153, 60 S. E. 461; Lutolf v. United Electric Light Co., 184 Mass. 53, 67 N. E. 1025; Osborne v. Tenn. Electric Power Co., 158 Tenn. 278, 12 S. W. (2d) 947, 950, and Bowen & Son v. Iowa Public Service Co. (C. C. A.) 35 F. (2d) 616, 619.

In the Osborne Case it is said:

"We do not mean to say that in every instance the defendant should cut off its current upon being advised that its line is endangered. The character of the notice received, the nature of the threatened danger, the situation of the informant, his appearance and position, and other circumstances, are to be considered in deciding whether it is prudent and proper to cut off the current."

In the Bowen Case it is said:

"Under some circumstances there may be a duty of such companies to cut off the current until the danger is removed upon receiving notice that a wire, carrying a dangerous current of electricity, is down in a public street or alley."

We have found no case wherein it is held to be negligence to allow a current to continue under circumstances such as we have here.

In Eaton v. City of Weiser, 12 Idaho, 544, 86 P. 541, 118 Am. St. Rep. 225, the city owned an electric lighting system. About noon, March 7, 1904, some one felled a tree across the line. No current was on then. The tree was removed and that left the wires sagging in the street. About 2 p. m., its line repair man was notified of the situation. Later its superintendent was notified. The repairs were not made. As night fell the current was turned on. A 17 year old boy was injured as he rode horseback along the street. A judgment for $1,-050 was affirmed, but let it be noted this was on one of the principal streets of the city.

### The Other Side.

It must not be forgotten that cutting off this current might plunge into utter or semi darkness parties in cellarways or on attic stairs, or working about dangerous machinery, riding in elevators, or working in mines, and dependent on this current for fresh air or escape, etc.

These are some of the things to be considered by this power company in determining how it should go

708

about the rectification of a situation thrust upon it by another, and in foreseeing all those resulting dangers a reasonably prudent man would anticipate.

### Repairs.

Upon the power company rested the duty to repair promptly, which it did; for although its crew had to come a distance of about 50 miles, it came, and the repairs were complete within two hours after the company learned this tree was on its line.

No negligence of the power company appearing in the evidence, its motion for a directed verdict should have been sustained. Other questions are reserved.

Judgment reversed.

The whole court sitting.