## FUTRELL v. ARKANSAS–MISSOURI POWER CORPORATION.
### No. 11390.

Circuit Court of Appeals, Eighth Circuit.
June 26, 1939.

mediately south of the Dortch building. The Shaver building extended westward to the alley; the Bland building extended only a portion of the distance westward to the alley, and the Dortch building lacked about twenty-five feet extending as far to the westward as the Bland building, so that an open court or yard was formed at the rear of the Dorch building and between the Bland and Shaver buildings.

The clothes line was fastened to a post at the southwest corner of the Dortch building and ran diagonally in a northwesterly direction across the court to the southwest corner of the Bland building to which it was attached by a nail driven through the metal covering of the building and into a joist. This line had been used almost daily for two years prior to the date of the accident for drying the towels and linens of the cafe and had been used by others at an earlier hour on the day of the accident. It had never been found to be charged with electricity.

One of defendant's transmission lines, carrying 2,300 volts of electricity, ran along the street on which the buildings fronted. A transformer was used to reduce the current to a 110–220 volt construction and wires to serve the buildings mentioned were attached to the north side of the Shaver building which was somewhat higher than the other buildings. The service wires entered the Dortch building at the rear and the Bland building at the front.

On the afternoon of the accident the defendant changed the service wires leading into the Bland and Dortch buildings. The meter was moved from the rear of the Dortch building to the front and the service wires brought into that building at the front. The meter in the Bland building was moved and the wires to serve that building were attached to a post near the northeast corner of the building and brought into the building at that corner. The defendant installed and maintained the transmission and service wires from the transformer to the meter and the respective customers installed and maintained all interior wiring and fixtures beyond the meter switch. The service line to the buildings consisted of two "hot" wires each carrying 110 volts and a "neutral" wire. A connection of the two hot wires with the neutral wire would produce a 220 volt current of electricity and this arrangement was called a 110–220 volt construction.

S. L. Richardson, of Walnut Ridge, Ark., for appellant.

C. M. Buck, of Blytheville, Ark. (H. L. Ponder, Sr., of Walnut Ridge, Ark., on the brief), for appellee.

Before GARDNER and WOODROUGH, Circuit Judges, and BELL, District Judge.

BELL, District Judge.

This is an action by Appellant against the Appellee to recover damages for personal injuries. At the close of all the evidence the Court directed a verdict for the Appellee and this appeal followed. The parties will be designated as in the court below.

The plaintiff was employed at the Dortch Cafe, Corning, Arkansas. On the afternoon of October 16, 1936, while she was engaged in hanging towels on a metallic clothes line at the rear of the building in which the cafe was conducted, she received an electric shock that resulted in serious injuries. She alleged negligence generally and relied on the doctrine of res ipsa loquitur.

Three one-story buildings, all fronting eastward on the principal street of the town, are involved: The Bland building on the northeast corner of the block, which was covered with corrugated metal, the Dortch building, a frame structure immediately south of the Bland building, and the Shaver building, a brick structure im-

About an hour after these changes were made in the wiring of these buildings, the plaintiff, when in the act of hanging a wet towel on the line, placed her hand on the line and received a severe electric shock. She said that she put her hand on the line and it stuck and that she could not pull it loose. She was assisted in freeing herself by a companion. She was standing on the wet ground and the current evidently passed from the clothes line through her body and into the ground.

In a few minutes after the accident Huddleston, a "trouble shooter," employed by the defendant, climbed to the top of the Bland building, went to the northeast corner, examined the wiring and said, "This is where the shortage is at." He placed rubber gloves on his hands and pried the wires from the side of the building with a tool which caused "a streak of fire." At that time he said, "This will be alright until morning."

On inspection after the accident it was discovered that the metal covering of the Bland building and the clothes line were charged with 40 to 45 volts of electricity. There is a dispute under the evidence as to the volume that may have been in the clothes line at the time of the accident. The plaintiff had never received a shock from the line before, although she had often used it over a period of many months as an employee of the cafe, and she did not know that it was charged with electricity at the time of the accident.

It was the theory of the plaintiff that the defendant was negligent in changing the wiring and that because of some defect that resulted the metal covering of the Bland building became charged with electric current that was transmitted to the clothes line.

The defendant denied negligence and alleged contributory negligence and assumption of risks. It offered testimony to show that its system of wires was not defective in any respect, that the electricity found in the building and the clothes line was due to a defect in the interior wiring and equipment of the Clay County Gin which was two blocks north of the Bland building, and that the defendant had no supervision or control over the wiring and equipment at the gin where the defect was found. According to the evidence of the defendant, a small air compressor motor was used at the gin; and, even though it was grounded, the current therefrom found its way to the neutral wire of the defendant leading to the Bland building and thence to the clothes line.

The defendant contended that the doctrine of res ipsa loquitur did not apply because: (1) It had no supervision or control over the premises involved, and (2) that if the doctrine was made applicable by the testimony of the plaintiff, it was entirely controverted by the testimony of the defendant as it was conclusively proved that the electricity in the clothes line was not due to any defect in the wiring and equipment of the defendant but was the result of a defect on the premises and in the equipment of the Gin Company.

It is elementary that in considering a motion to direct a verdict the testimony and all inferences that reasonably may be drawn therefrom must be accepted in the light most favorable to the plaintiff. Adams v. Barron G. Collier, Inc., 8 Cir., 73 F.2d 975.

It likewise is elementary that an issue of negligence generally is a question for the jury and only where all reasonable minds must reach the same conclusion from the facts does it become one of law for the Court and justify the direction of a verdict. Glynn v. Krippner, 8 Cir., 60 F.2d 406; May Department Stores Company v. Bell, 8 Cir., 61 F.2d 830.

An electric company, because of the very nature of its business, is required to use a high degree of care in the erection, maintenance, operation and inspection of its plant and equipment used in the generation and transmission of electricity for the protection of those likely to come in contact therewith. Dierks Lumber & Coal Company v. Brown, 8 Cir., 19 F.2d 732; Arkansas Light & Power Company v. Cullen, 167 Ark. 379, 268 S.W. 12; Arkansas General Utilities Company v. Shipman, 188 Ark. 580, 67 S.W.2d 178.

Electricity is a subtle, invisible, noiseless, death-dealing agency that gives no warning of its presence. Gas may be detected by its odor, water may be seen, but an ordinary wire may be charged with electricity of a high voltage and yet give no warning of the hidden danger; so, there is a grave reason why those engaged in the production and distribution of this extensively used commodity should be required to exercise a high degree of care for the protection of patrons, customers and

those rightfully on the premises where it may exist. A modern utility provides its equipment, employs its engineers and constructs its system in the public streets and alleys and to the homes and business buildings of the country, in the populous centers and along the countryside, and thus exposes the people to constant danger. Only the use of skill in construction, care in supervision, inspection continually, and caution at all times will prevent injuries and fatalities; indeed, eternal vigilance is the price of safety.

Where injuries are sustained from electric current flowing from the wiring and equipment that is under the management and control of the defendant, and the accident is such as would not have happened in the ordinary course of events if due care has been used, there arises, on proof of the injury, an inference of negligence which makes a prima facie case. Pine Bluff Company v. Bobbitt, 168 Ark. 1019, 273 S.W. 1; Chiles v. Ft. Smith Commission Company, 139 Ark. 489, 216 S.W. 11, 8 A.L.R. 493; Arkansas General Utilities Company v. Shipman, supra; Arkansas Light & Power Company v. Jackson, 166 Ark. 633, 267 S.W. 359; Texarkana Gas & Electric Light Company v. Orr, 59 Ark. 215, 27 S.W. 66, 43 Am.St. Rep. 30; Southwestern Telegraph & Telephone Company v. Bruce, 89 Ark. 581, 117 S.W. 564; May Department Stores Company v. Bell, supra.

In the Chiles case the Supreme Court of Arkansas quotes with approval a very explicit statement of the rule pertaining to the applicability of res ipsa loquitur from 20 R.C.L., Section 156, as follows: " * * * More precisely, the doctrine res ipsa loquitur asserts that whenever a thing which produced an injury is shown to have been under the control and management of the defendant, and the occurrence is such as in the ordinary course of events does not happen if due care has been exercised, the fact of injury itself will be deemed to afford sufficient evidence to support a recovery, in the absence of any explanation by the defendant tending to show that the injury was not due to his want of care. * * * The presumption of negligence herein considered is, of course, a rebuttable presumption. It imports merely that the plaintiff has made out a prima facie case, which entitles him to a favorable finding, unless the defendant introduces evidence to meet and off-

set its effect. And, of course, where all the facts attending the injury are disclosed by the evidence, and nothing is left to inference, no presumption can be indulged —the doctrine res ipsa loquitur has no application. * * *" [139 Ark. 489, 216 S.W. 14, 8 A.L.R. 493.]

The language of the same Court in the Bobbitt case should be observed: " * * * Under the circumstances of the injury a prima facie case of negligence on the part of appellant was made which entitled appellee to go to the jury and placed the burden on appellant to justify or excuse its negligence. The undisputed evidence revealed that the child received the injury from coming in contact with appellant's guy wires, while playing near the roadside, which should not have been carrying electricity in the proper operation of the plant. This guy wire was under the control and management of appellant. Southwestern Telegraph & Telephone Co. v. Bruce, 89 Ark. 581, 117 S.W. 564; Commonwealth Public Service Co. v. Lindsay, 139 Ark. 283, 214 S.W. 9; Arkansas Light & Power Co. v. Jackson, [166 Ark. 633] 267 S.W. 359. It was appellant's current of electricity which burned the child, and it could not excuse itself by simply showing that the current was connected to the guy wire from its tension wire through a foreign wire attached to the two by some third party. It was required to do more than that to exculpate itself from the prima facie case of negligence made by proof of the injury and the manner thereof. It must be shown in addition that it used ordinary care to discover and remove the foreign wire." [168 Ark. 1019, 273 S.W. 2.]

In the light of these authorities, we direct attention to some of the very pertinent facts that a jury might have found from the evidence in this case: It is uncontroverted that the defendant was the only party engaged in distributing electricity in the town; that its transmission line carrying 2,300 volts ran along the street on which the buildings fronted; that it exclusively owned and controlled the wires serving the buildings; that it had changed these wires and their connections shortly before the accident; that two hot wires carrying 220 volts were attached to the northeast corner of the metal-covered Bland building; that the neutral wire leading to the building was charged with some electricity; that the defendant served the

Clay County Cotton Gin Company; that no changes had been made in the wiring and equipment at the gin and no defect was known to exist there until after the accident to the plaintiff.

There was substantial evidence to sustain a finding by the jury that the hot wires leading to the Bland building contacted the metal covering as the building was charged with electricity and as there was a flash when the wires were pried from the building by an employee immediately after the accident; that the neutral wire was not grounded at the Bland building as shown by the testimony of the witness Johnson, an expert, and that the covering of the building and the clothes line were charged with more than 40 volts of electricity as the hot wires combined carried 220 volts and as shown by the extent of the injuries to the plaintiff. According to the testimony of the defendant, when the test was made with a volt meter after the accident, the clothes line was charged with about 40 volts, but apparently the test was not made until after the wires had been pried loose from the building by Huddleston.

The physical condition of the plaintiff after the accident is significant. She was nineteen years of age, had been strong, healthful and capable of doing work requiring great physical endurance. A doctor who was called immediately after the accident found her "hysterical, a raving maniac, with her heart fibrillating and beating 140 per minute." Morphine was administered. She now has a permanent heart enlargement or lesion, a systolic heart murmur, has improved as much as she ever will, is unable to endure exercise, child birth would be dangerous, and "she may live a year or die in a minute." The doctor was of the opinion that her condition is due to the electrical shock she received at the time of the accident. He was corroborated by another doctor who had examined her. Two doctors examined the plaintiff and testified on behalf of the defendant. They found a distinct systolic murmur which could be heard all over the chest, front and back, and an enlargement of the heart. They expressed an opinion that the condition was congenital and not the result of the shock. If the jury believed the witnesses for the plaintiff as to the extent of the injuries, they might have found that a current of high voltage passed through her body because such injuries do not result from a slight electrical shock. Regardless of the voltage in the clothes line at the time the test was made, the jury would have been sustained in finding that she was severely injured from an electrical shock.

■■ It was not necessary for the plaintiff to prove that the defendant had supervision and control over the Bland building or the clothes line. It was sufficient for her to show facts justifying a conclusion that the current which injured her came from wires of the defendant over which it had exclusive supervision and control. In this respect the evidence was ample. Therefore, we have no difficulty in reaching the conclusion that the doctrine of res ipsa loquitur applied and that the plaintiff made a prima facie case.

The next question for consideration is whether the explanation offered by the defendant was sufficiently conclusive to overbalance the prima facie case of the plaintiff and justify the direction of a verdict. The defendant contends that he did not have exclusive control of the premises, but as we have seen, that contention cannot be sustained. Incidentally, it might be observed that the defendant had such access to the place of the defect and such control over the premises as to be able to enter and promptly correct the defect after the accident had occurred.

■ The defendant next contends that it traced the source of the current to the premises and equipment of the gin. The witnesses advanced several theories by which the current could have been transmitted from the gin to the Bland building: (1) The ground at the gin could have transmitted a current into the earth which conducted it to the Bland building, (2) the grounding of the neutral wire at the gin could have caused the earth around the ground rods of the neutral wire to dry and thus create a voltage which charged the neutral wire and in turn the Bland building, and (3) the grounding of the wire at the gin could cause the current to flow on the neutral wire and thus reach the Bland building. These theories were advanced by employees of the defendant who are experts or who have some knowledge of electricity. Their credibility and the weight to be given their testimony was for the jury to determine and the jury was not required to believe them. At most, this testimony conflicted with that of the

plaintiff and presented a question of fact for the determination of the jury. Gunning v. Cooley, 281 U.S. 90, 50 S.Ct. 231, 74 L.Ed. 720. Even if these theories are accepted, it appears that the current reached the building on the defendant's wires and it makes no difference whether they were the hot wires or the neutral wire that in some way had become charged. If the hot wires had been properly insulated and connected, and the neutral wire had been properly grounded, the metal covering of the building and in turn the clothes line would not have been charged. The current that did violence to the plaintiff certainly did not come from the air compressor motor in the gin; so if the current came from the gin it was produced by the defendant and it was transmitted on defendant's wires. Such might have been the conclusions of the jury. If there was a defect in the construction of defendant's equipment at the Bland building, it was responsible for injuries proximately resulting therefrom. Fox v. Keystone Telephone Company, 326 Pa. 420, 192 A. 116, 110 A.L.R. 1182.

It is significant that no evidence was offered by the defendant to show that an inspection of the premises was made after the changes in the wiring, if an inspection had been made, and it was the duty of the defendant to make an inspection. Moreover, the employees of the defendant who made the changes were not called as witnesses in behalf of the defendant, or so that they might be cross-examined, but instead, witnesses who merely observed what had been done were called to testify. There is a presumption that the employees who did the work, if produced, would not have testified favorably to defendant's contentions.

The conclusion is inevitable that the explanation of the defendant fell far short of overcoming the prima facie case made by the plaintiff and it certainly was not of such character as to justify a directed verdict. The evidence was not merely circumstantial in character; it was direct, positive and entirely adequate to sustain a verdict for the plaintiff. We are convinced that the testimony was ample to require a submission of the issues to the jury, irrespective of the doctrine of res ipsa loquitur.

The judgment is reversed and the case is remanded for a new trial.