## TENNESSEE ELECTRIC POWER CO. v. HANSON.—79 S. W. (2d) 818.

Middle Section.    December 22, 1934.

Petition for Certiorari denied by Supreme Court, March 9, 1935.

T. Pope Shepherd, of Chattanooga, and Horace Frierson, Jr., of Columbia, for plaintiff in error.

Hugh Lee Webster and Hugh Todd Shelton, both of Columbia, for defendant in error.

DeWITT, J. About 7 A. M., on January 13, 1932, Henry Hanson was killed by a current of electricity which passed through his body from a wire or wires of the Tennessee Electric Power Company, which were attached to poles which had fallen or been blown down along the west side of the Santa Fe Pike. His widow as administratrix brought this action against the company for damages for wrongful death of her husband, alleging that the company was guilty of negligence in failing to maintain properly its said line, in that the poles were rotten, causing the line to fall upon the road; that the wires were uninsulated, making contact therewith dangerous; that the company failed to cut off the current after notice that the line was down upon the road; and that these negligent omissions of duty were the proximate causes of the death of Henry Hanson.

Under its plea of the general issue the defendant denied that it was guilty of negligence proximately causing the accident, and it sought to show that the deceased was guilty of contributory negligence, or at least remote negligence. Upon the trial, the jury rendered a verdict awarding $16,500 as damages, but the trial judge

suggested a remittitur of $3,500, which was accepted by the plaintiff; and a judgment for $13,000 was entered. From this judgment the company appealed and assigned errors.

The company concedes negligence in the condition and maintenance of its line, there being substantial evidence of it; but it insists that there is no evidence to sustain the charge of negligence in failure to cut off the current after receipt of information that the poles and wires were down. It concedes, however, that this is of little importance, inasmuch as negligent maintenance is conceded. Then the question is narrowed to that of contributory or even remote negligence of the deceased in driving his car through the narrow space between the poles and wires and the edge of the road with the heavily charged wires in dangerous proximity to the car as it passed along.

At the time of the accident, the Tennessee Electric Power Company was the owner and operator of a hydro-electric plant, including power stations, transmission lines, pole lines, and franchise rights in Maury county, including also an uninsulated transmission line, consisting of wires fastened to poles, carrying 2300 volts of electricity, running from the corporate limits of the city of Columbia out and along the Santa Fe Pike and by the place of the accident, which was about one and one-half miles from the city. This line was formerly a telephone line. In 1928 it was acquired by the Southern Cities Power Company, and some of the old poles were replaced with new ones, but the cedar poles were not replaced. In 1929, it was purchased with other and similar properties by the Tennessee Electric Power Company. No inspection of it was made after that time. The custom of the company was to make no inspection until after the first six or seven years, and then to make annual inspections. These facts appear without dispute.

Henry Hanson was thirty-four years of age at the time of his death. He lived in his home on the Theta Pike a little over a mile from Columbia. He was an expert stonecutter, employed by a marble monument company; but at the time of the accident the plant was closed, and he spent much of that period in hunting and trapping. His father lived on the Santa Fe Pike about half a mile toward Columbia from the place of the accident. On the morning of the accident he arose early and about fifteen minutes before 7 o'clock he left home in his car to go out the Santa Fe Pike to visit some traps which he had placed in the neighborhood of the place of the accident. There is evidence that it was a dark, foggy, misty morning. His father testified that he saw him pass his home at about 7 o'clock. Mr. C. F. Church testified that he resided on the Santa Fe Pike between the scene of the accident and Columbia; that on that morning he left his home a little before sunrise to go out the Santa Fe Pike in his automobile; that he soon came to where the poles and wires were down, stopped his car, and got out after passing around the

first pole, and found the dead body of Henry Hanson on the ground on the right-hand side of his automobile going out from Columbia; that the engine of Hanson's car was running and its lights were burning; that on the left-hand side of that car one wire was just above the fender and another was between the latch and the top of the car, both wires resting against the car; that this was at a low place in the road where water stood; that the dead body was in a pool of water, with the exception of face, head, and one shoulder. He said that the nearest pole was decayed and broken off at the ground. A number of other persons who came to that place about that time testified that three poles were leaning or down; that this middle pole was resting with the cross-arms on the ground; so that the wires which touched Hanson's automobile were three feet or more above the ground. Mr. Church testified that the Hanson car was over to the right-hand side of the road about three feet from the edge of a ditch which was near the fence; that the body was close to the car. On cross-examination he was asked and he answered:

"Q. When you pulled out, did you pull out into the ditch? A. Yes. Right into the ditch.

"Q. To the edge of the ditch? A. Right against the bank.

"Q. Right into the bank? A. Yes, I was hugging the bank.

"Q. You were hugging the bank? A. Yes, sir.

"Q. And you missed the pole when you did that? A. Yes, sir.

"Q. How far had you gone when you passed the second—did you pass the second pole? A. No, sir.

"Q. With your car? A. No, sir.

"Q. But the Hanson car was beyond the second pole? A. No, sir, this side of the second pole.

"Q. This side of the second pole? A. Right at it, he could not get around it without backing up, he was right in it, you might say, he had to back up to get around it, because he had pulled, when he had passed the first pole, from the tracks I saw, he had pulled back into the road.

"Q. Back into the road? A. Yes, and had gotten into the wires and had went on down to the second pole in the wires and had gotten down there, and he could not pass the second pole without backing up and going around it, getting in the ditch to go around it.

"Q. Through the water? A. Yes, sir.

"Q. But, if he had stayed in the ditch and not pulled back in the road between the two poles, he could have passed the whole thing and gone on? A. I would judge so, yes. It was a close ride, but he could squeeze by.

"Q. You had noticed tracks where other cars had gone by didn't you? A. I never noticed particularly about the tracks, but I understood other cars did go by.

"Q. And he could have gotten by, by going out in the ditch?

"Q. How many poles do you say were down, Mr. Church? A. Three poles.

"Q. Three poles? A. Yes, sir.

"Q. The one you went around was down, wasn't it? A. Yes, sir.

"Q. Was the one towards town from that leaning a little? A. Leaning slightly.

"Q. But not down? A. That is right.

"Q. Then you came to the down pole, that is the pole was pretty near down on the road? A. Yes, sir.

"Q. The next was down? A. The next one down.

"Q. And the third one down? A. The third one down.

"Q. Was it down or just leaning? A. Down all the way.

"Q. You think the three poles were down? A. Yes, sir."

Mr. Church also said that the latch of the door of Hanson's car against the wires was open so that one could possibly stick two fingers in the opening of the door, as if Hanson had attempted to get out on the left-hand side of the car. However, the jury probably inferred, and the inference was most reasonable, that Hanson first tried to open the left-hand door, but when he found it against the wires, a circuit not yet being made, he opened the right-hand door and stepped into the water with his hand on the car, so that a circuit was made, and he fell dead into the water. There is evidence that there was a burn on his right hand and there was a burn on the left-hand side of the car.

On the night before the accident there was a rain and windstorm, a heavy rain and a hard wind, but Mr. Church said that it was not a cyclone or a dangerous storm. It is inferable that the force of this wind broke the poles and threw them nearly across the road.

Dick Frazier, who came to the place from the opposite direction while Mr. Church was there, testified that the right-hand wheels of Hanson's car were six or seven inches deep in the water. He said that he could have driven through that place if Hanson's car had not been in the way.

Other witnesses who came to the place corroborated these witnesses, saying that the poles were rotten, two of them down with the wires; and that the best or even the only way to get around these obstructions was drive into the ditch.

There is evidence that the middle pole, which was a cedar pole and which broke off at the ground from utter decay, had stood there when it was used for a telephone line and was not replaced and had not been inspected after it began to be used to support high tension, heavily charged wires.

The defendant company was bound to a high degree of care in the construction and maintenance of its poles and wires along this public highway. It is the imperative duty of such a company not only to install proper appliances, but also to make reasonable and

proper inspection of such appliances, and to use due diligence to discover and repair defects therein, and failure to do so constitutes negligence. This duty extends to the public generally, in so far as members of the public without contributory fault may be exposed to the perils arising from the operation of the electrical plant. These rules are so well settled as not to require citation of authorities.

■ There is also evidence from which the jury could reasonably infer that the company had notice before the accident that the poles were down on this highway, and that it was negligent in failing to cut off the current by opening the switch controlling the current which went over this line. There is evidence that there was such a switch at the plant that could be opened to throw the current off.

Virgil Moore, who was connected with the county workhouse, testified that early on that morning he was informed by one Andrew Brown of the power line being down on the Santa Fe Pike, and knowing that the workhouse crew was going out that pike on that particular day he, about 6 o'clock in the morning, called Pillow Due, the superintendent of the workhouse, and told him of the poles and wires being down; that upon instruction given by Due, he called Mr. Watson, the district manager for the company, and told him that the power line was down, and Mr. Watson replied, "I will see to it, or I will attend to it." Mr. Watson testified he received this notice and that he did not cut off the current because it was his custom to make investigation before the current should be shut off, as doing so would have thrown one-third of the lighting customers out of service. He sent a man there to repair the trouble, but he arrived after Hanson had met his death.

In Osborne v. Tennessee Electric Power Company, 158 Tenn., 278, 12 S. W. (2d), 947, 949, it was held that, when an electric power company, maintaining wires carrying strong and powerful currents is reliably informed of the location of a conflagration of a serious nature, reaching its highly charged wires, it would be the duty of the servant in charge to cut off the current, and if he fails or refuses to do so he would be guilty of negligence which would be imputed to his employer. In the opinion, the following statement is quoted with approval:

"Where an electric company receives notice that its wire is down in the street it should instantly turn the current off and keep it off till proper precautions are taken to prevent danger to persons or property from the fallen wire, and until it is ascertained that it is safe to turn it on"—citing 20 C. J., 357; Lutolf v. United Electric Light Co., 184 Mass., 53, 67 N. E., 1025; Mayor, etc., of Madison v. Thomas, 130 Ga., 153, 60 S. E., 461; Lexington Utilities Co. v. Parker's Adm'r, 166 Ky., 81, 178 S. W., 1173.

We now deal with the question of negligence of the deceased as

proximately or even remotely contributing to his death. As aforesaid, this presents the only real issue upon this appeal in error.

It is contended even that the concurrence of the power company in permitting the line to be in the road and the negligence of the deceased in driving into a place of obvious danger was the cause of his death. It is indeed a matter of common knowledge that electricity is dangerous and deadly, and that contact with electric wires is hazardous; and it might be inferred that the deceased possessed this knowledge. It was of course his duty in the presence of any known danger to exercise active diligence for his own safety, and his failure so to act would be negligence. In the brief of counsel for plaintiff in error many cases are cited holding the persons injured or killed by contact with electric wires were so negligent that recovery should be denied. We cannot undertake to discuss and distinguish these decisions, for each case is at last determinable upon its own facts. This case is unlike those in which employees of electric companies, of expert knowledge and much experience, received injuries; or those in which persons injured were reckless and daring or utterly thoughtless. It is a case in which the person killed, a young man without experience with electric wires, was driving along the highway in mist and darkness, his lights showing the way ahead, suddenly and unexpectedly being confronted with wires and poles obstructing much of the road, and with a ditch and water on his right-hand side. The first pole was not leaning so far that he could not safely go under it. It might be inferred that at that point he could not see the next pole as it was lying down with its cross-arms holding the wires above the ground; that when he reached the second or middle pole he thought that he might clear the wires and yet avoid the ditch on the other side. It may be inferred that he became excited and distressed in mind at this emergency. In trying to go ahead he caught his car in the heavily charged wires. His car could not go forward. He realized then that he must get out of the car. It must not have occurred to him that the contact of the car with the wires needed only a completion of the circuit with the ground or with water for the current to go through the car and himself. He must not have realized that if he kept his hand on the car as he stepped out he could make this deadly circuit. These inferences could reasonably be made by the jury. They could properly presume that he did not intend to commit suicide. In the absence of eyewitnesses, there is a presumption that arises out of the well-known instinct of self-preservation, that the deceased was in the exercise of ordinary care at the time of the injury which caused his death. In Tennessee Cent. Railroad Co. v. Herb, 134 Tenn., 397, 183 S. W., 1011, this presumption was definitely declared and applied; and it has since been applied in other reported cases. See, especially, L. & N. Railroad Co. v. Frakes & Payne, 11 Tenn. App., 593.

It is well settled in this state, and in many other jurisdictions, that one who through the negligence of another, and not through his own negligence, suddenly finds himself in a position of peril, and is compelled to act instantly to avert an injury to himself, is not guilty of negligence if he makes such a choice as a person of ordinary prudence placed in such a position might make, even though he did not make the wisest choice. Power Packing Co. v. Borum, 8 Tenn. App., 162, 169, citing cases. In Moody v. Gulf Refining Co., 142 Tenn., 280, 218 S. W., 817, 8 A. L. R., 1243, the rule stated in 20 R. C. L., 29, was appealed as follows:

"One who in a sudden emergency acts according to his best judgment or who, because of want of time in which to form a judgment omits to act in the most judicious manner, is not chargeable with negligence." In 22 R. C. L., 145, it is said:

"When a person has been put in sudden peril by the negligent act of another, and in an instinctive effort to escape from that peril, either suffers injury himself, or does injury to a third person, the negligent act is the proximate cause of the injury, and it is immaterial that under different circumstances he might or ought to have seen and avoided the latter danger."

It is true that the presence of fallen poles and wires in the road is an admonition of danger, but such objects may appear too late for the traveler to avoid an emergency and exercise a calm judgment how to avoid the danger. The argument in support of the claim that the deceased was negligent would well apply to such situation appearing in broad daylight, but it has little force as to a dangerous condition very suddenly appearing amid darkness and fog. The young man evidently made an effort to extricate himself from the very dangerous situation, and in his haste and excitement he most unfortunately failed to separate himself from the car before he touched the ground or the water. Such are reasonable inferences.

There is little, if any, dispute as to the facts. The deceased drove along the road under the first pole to the narrow place between the down pole and the ditch and the water. His car was caught with the wires. He was found dead in the pool of water. The jury has inferred that he was not guilty of contributory negligence. In view of all the circumstances, we cannot say that the inference was lacking in substantial foundation, or was unreasonable. The applicable rule declared in Philip Carey Roofing & Mfg. Co. v. Black, 129 Tenn., 30, 164 S. W., 1183, 1185, 51 L. R. A. (N. S.), 340, is as follows:

"The question of contributory negligence, as well as the question of negligence, is ordinarily for the jury. Even though the facts be undisputed, if intelligent minds might draw different conclusions as to whether, under circumstances conceded, the conduct of a plaintiff was that of an ordinarily prudent man, the matter should be left

to the jury. The court should draw no inference when in doubt, but only in those cases where the evidence is without material conflict, and such that all reasonable men must reach the same conclusion therefrom. It is only in cases where the evidence is susceptible of no other fair inference that the court is justified in instructing the jury, as a matter of law, that the plaintiff has been guilty of contributory negligence which would bar his recovery.''

██ It may be that the trial judge suggested the remittitur of $3,500 in the belief that the deceased was guilty of negligence not proximately contributing to his death. However this may be, we do not think that the award of $13,000 is excessive for the life of this young man. It is undisputed that he was 34 years of age, of sound health, industrious, and earning about $175 per month at his trade, as well as from $200 to $300 per year during his leisure hours in hunting and trapping. By the tables of mortality he had an expectancy of about thirty years of life.

It results that all the assignments of error are overruled, and the judgment of the circuit court is affirmed.

Code, section 7308, provides: ''Interest shall be computed on every judgment from the day on which it was entered of record.'' On May 29, 1933, the verdict for $16,500 was rendered and the clerk entered upon the minutes a judgment therefor, as required by Code, section 10093, subsection 3. The motion for new trial was taken under advisement by the court, and his decision thereon was rendered on December 8, 1933, when, upon the remittitur being suggested and accepted, a judgment was rendered and entered on the minutes for $13,000.

In behalf of the defendant in error it is insisted that upon affirmance this court should include interest from May 29, 1933, instead of December 8, 1933. The theory advanced is that the first judgment was only suspended by the entry of the motion for new trial, and that the effect of overruling the motion was merely to remove the suspension to the extent of the amount to which the judgment was modified.

██ The rule is that the entry of a motion for a new trial within thirty days after judgment suspends the judgment for the purpose of disposing of the motion for a new trial only. Feldman v. Clark, 153 Tenn., 373, 284 S. W., 353.

In Louisville & N. R. Co. v. Ray, 124 Tenn., 16, 134 S. W., 858, 860, Ann. Cas., 1912D, 910, it is said: ''The judgment for the purposes of the motion is treated as being nonexistent.'' There is no final judgment or decree for the purpose of an appeal as long as the cause is still under the control of the trial court by reason of the pendency of a motion for a new trial. 3 C. J., 465, and cases cited.

In Louisville & N. R. Co. v. Ray, supra, it is said:

''When a new trial is refused by the trial court, then only can

an appeal be prosecuted from the judgment. For such purposes of appeal the judgment, although previously entered, really dates as of the order of the court overruling the motion for new trial. The appeal is then prayed, and if duly prosecuted, brings up for review all of the points made in the motion for a new trial, and duly assigned for error in the appellate court, and that court thus acquires control of the judgment entered in the trial court. It is not correct to say, as held by the Court of Civil Appeals, that the appeal is from the order of the lower court overruling the motion for new trial. As we have already stated, when a motion for new trial is made within 30 days the existence of the judgment is ignored, and upon the motion being overruled the judgment for purposes of appeal must be treated as if then entered upon the verdict. The previous entry is made in obedience to the section of the Code above referred to (Shannon's Code, section 5892, subsection 3; Acts 1805, ch. 45, sec. 2), which was enacted to prevent the delay in entries of judgment which at common law sometimes resulted in the failure to make the entries altogether.''

In Dunn v. State, 127 Tenn., 267, 154 S. W., 969, 970, it is said:

''If the judgment be entered at the trial term, before the entry of a motion for a new trial, the latter, when made and entered, if this be done within 30 days after such entry of judgment, suspends the judgment until the motion is finally disposed of; and, if it be overruled, the judgment stands as of the date of the overruling of such motion, or' of its disposition whether overruled or sustained.''

The time within which a party may appeal, file an appeal bond or take the pauper's oath, and file his bill of exceptions, begins to run from the date of the judgment overruling the motion for new trial, and not from the date of a judgment entered before the entry of the motion for new trial.

It is clear, therefore, from these rules and decisions, that the judgment upon which interest is to be calculated is the final judgment entered when the motion for new trial is overruled.

A judgment will be entered in this court in favor of the defendants in error against the plaintiff in error for the sum of $13,000, with interest from December 8, 1933, and all costs of this cause. The costs of the appeal in error will also be adjudged against the surety on the appeal bond.