JUANITA VAUGHN et al., Appellants, v. L.
KENNETH JOHNSON, Administrator of the Estate
of Norman Chester Allison, et al., Appellees.

MAURICE DEMONBREUN, Administrator of the
Estate of Brenda Cleo Vaughn, Appellant, v.
L. KENNETH JOHNSON, Administrator of the
Estate of Norman Chester Allison, et al., Appellees.
—476 S.W.2d 655

Middle Section. July 30, 1971.

Rehearing Denied August 27, 1971.

Certiorari Denied by Supreme Court January 17, 1972.

598

John T. Conners, Jr., Herman O. Loewenstein, Nashville, and Mabry Covington, Jr., Franklin, for appellants.

W. W. McNeilly, Jr., Watkins, McGugin, Finch & McNeilly, Nashville, for defendants Blackwell and Lewisburg Transfer Co., Inc.

L. Kenneth Johnson, pro se.

## THE CASE

SHRIVER, P.J. (M.S.). This appeal involves two suits arising out of the death of Mr. and Mrs. James E. Vaughn, who were killed in an automobile accident March 21, 1969.

The first suit was brought by the four minor children of the deceased Mr. and Mrs. Vaughn, through their guardian and next-of-kin, Thirty Mae Vaughn, against L. Kenneth Johnson, Administrator of the Estate of Norman Chester Allison, and against Ralph J. Black-well, driver, and Lewisburg Transfer Company, Inc., owner, of the truck that collided with the Vaughn automobile, for the wrongful death of Mr. Vaughn.

In the second suit, Maurice Demonbreun, father of the deceased Mrs. Vaughn, qualified as Administrator of her estate and brought action for her wrongful death for the use and benefit of the Vaughn minor children.

At the conclusion of the plaintiffs' proof, a motion was made for a directed verdict in favor of the defendants and was overruled. Said motion was renewed at the conclusion of all of the proof and was taken under advisement by the Trial Judge and the causes submitted to a jury which returned verdicts of $32,500.00 in favor of the plaintiffs in each of the two actions against all defendants as compensatory damages and returned verdicts of $100,000.00 punitive damages in each of the two cases against the estate of Norman Chester Allison, which estate was not represented by counsel at the trial.

Following the jury verdict, the Trial Judge sustained the motion for a directed verdict in the cases against

Ralph J. Blackwell and the Lewisburg Transfer Company, Inc., and so instructed the jury, but allowed the judgment to stand against the estate of Norman Chester Allison. Thereupon, plaintiffs perfected their appeal to this Court from the judgment of the Trial Court in directing a verdict in favor of Blackwell and Lewisburg Transfer Company, Inc., and have assigned errors.

## THE PLEADINGS AND PROOF

The Declaration in each case alleges that on March 21, 1969, Mr. and Mrs. James E. Vaughn and their children were riding in a 1965 Chevrolet automobile, being operated by Mr. Vaughn, proceeding in a northerly direction on U.S. Highway 41 in Williamson County, near Triune, Tennessee. Mrs. Vaughn was in the right front seat, while the children were in the rear seat; that on this occasion, Norman Chester Allison was operating a 1962 Ford automobile, going in the same direction on said highway; that a 1963 GMC tractor-trailer, owned by Lewisburg Transfer Company, Inc., and being operated by defendant, Ralph J. Blackwell, of Lewisburg, Tennessee, was traveling southwardly on U.S. Highway 41, meeting the automobiles of Allison and the Vaughns.

The accident in question occurred on March 21, 1969 about 6:15 p.m., when the road was dry and there was sufficient light for automobiles to be safely operated without turning on their lights. The highway is approximately twenty feet wide at this point and is straight with a slight downgrade from each direction toward the point of the collision. The Allison vehicle, traveling in the same direction, had just passed the Vaughn car, and was a few hundred feet ahead when it swerved to the left and

collided with the rear end of the tractor-trailer unit of Lewisburg Transfer Company, which, as aforesaid, was traveling in a southerly direction, meeting the oncoming automobile of Allison and that of the Vaughns. Following this collision, the truck left its right side of the road, veered suddenly to the left onto the left shoulder of the road, and struck the Vaughn automobile which Mr. Vaughn had pulled off of the roadway some ten feet onto the shoulder and had stopped.

The First Count of each Declaration is a common law count based on common law negligence, while the Second Count is a statutory one involving T.C.A. Sections 59-816, 59-823, 59-852 and 59-858, pertaining to vehicles remaining on their right and proper side of the roadway, the speed of vehicles, the speed of truck traffic, and reckless driving. The Declarations were amended to add sections of the Code pertaining to braking equipment required on truck and trailer units.

General issue pleas of not guilty were filed by all defendants.

## ASSIGNMENT OF ERROR

There is a single assignment, as follows:

"It is respectfully submitted that the Trial Court erred in taking under advisement motions for directed verdicts in each case, made at the conclusion of all the evidence by defendants, Blackwell and his employer, Lewisburg Transfer Company, Inc., and later sustaining the said motions after the issues were submitted to the jury, and the jury found in favor of the plaintiffs'

estates against Blackwell and Lewisburg Transfer Company, Inc.; and, further, the Court erred in not letting the verdicts of the jury be entered as the judgments of the Court and approved."

## THE FACTS

As hereinabove stated, the deceased Mr. and Mrs. Vaughn, and their four children were traveling northwardly toward Triune on U.S. Highway 41.

Prior to the accident, the Allison vehicle was seen by the witness, Robert A. Dodd, in College Grove, Tennessee, approximately two miles south of the scene of the accident and, as Dodd followed this automobile for about two miles, he observed that it was weaving from side-to-side on the road, and, as he stated, ran one or more cars off the road. He said that Allison was traveling at a fast rate of speed and, as he followed him, he was hoping to encounter a police officer to apprehend Allison. As he came over a hill south of where the accident occurred, he saw that it had already taken place.

The record indicates that, as the Vaughn automobile was approaching the scene, going slightly downgrade toward where the accident happened, the Allison car passed going at a rapid rate of speed. This fact was observed by Juanita Vaughn, one of the children, and she remarked to her father: "That truck is going to hit that car." As above stated, immediately after the Allison car passed the Vaughns, Mr. Vaughn drove his car off the right side of the road onto the shoulder and stopped it. The testimony is that his vehicle was ten feet off the paved portion of the road when it was struck by the

Lewisburg Transfer Company tractor-trailer which had veered to its left across the road crashing into the Vaughn automobile, instantly killing Mrs. Vaughn, and injuring Mr. Vaughn to the extent that he was dead upon arrival at the hospital.

In considering whether there is any material evidence to support the jury verdict and, thus, answer the question, whether the Trial Judge was in error in directing a verdict for the defendants, it is important for us to consider the testimony of Ralph J. Blackwell, the driver of the Lewisburg Transfer Company tractor-trailer unit.

He testified that he is a man 53 years of age, had been in the employ of Lewisburg Transfer Company as a truck driver for twenty-three years, was thoroughly familiar with the road on which he was traveling when the accident occurred. He testified that he had his headlights turned on but could see very well without them since it was between sundown and dusk; that it was slightly downhill for about three-quarters of a mile as he approached the scene of the accident; that there were no cars between him and the approaching car of Allison. He testified that he was traveling between 45 and 50 miles an hour and that the tractor-trailer had near the maximum load for the unit.

He was asked how far away the Allison automobile was when he first observed it approaching him. His answer was:

"I guess he was about seventy-five or a hundred feet when I first seen it."

He stated he did not remember whether it had its head-lights on or not, and he could not tell how fast it was going. He also stated that he did not see any other vehicle behind the Allison car and, when asked to state why he didn't see the Allison vehicle until it was within seventy-five or a hundred feet of him, his answer was:

"Why I didn't see it? No, sir, I don't know."

When asked if he could tell whether there was just one person in the car, he stated:

"I didn't pay any attention."

When asked if anything unusual occurred as the auto-mobile approached him, he stated:

"Nothing unusual until he got right close to me."

He testified that the car swerved over toward the middle of the road and, when asked how far away he was at that time, he stated that he could not tell but that he, Allison, was out in front of him when he swerved and, when asked whether the car gradually swerved toward him, he answered:

"He just gradually was coming towards the white line just before he got to me."

He testified that he did not blow his horn and, when asked what he, Blackwell, did, he answered:

"I just—I sort of pulled over to the right-hand side of the road and he went by me.

Q. You pulled to the right-hand side of the road and you didn't go off the pavement?

A. I didn't get off the pavement. I don't think I did. I don't remember."

When asked whether or not the Allison car had gotten onto the wrong side of the road when it passed the front of the tractor-trailer, he answered:

"I don't know whether he had crossed the line or not."

He further testified:

"Q. All right, sir, you didn't apply your brakes then?

A. No, sir.

Q. Did you look in your rear-view mirror as he passed you?

A. No, it was done so quick, I don't know if I looked in my mirror or not.

\* \* \* \* \* \*

Q. Did you continue on in the same manner that you were driving?

A. Yes, sir.

\* \* \* \* \* \*

Q. Well, Mr. Blackwell, what was the next thing that happened?

A. Well, the next thing that happened was just an impact.

\* \* \* \* \* \*

Q. What did you do?

A. I just held to the steering wheel. That's all I can say I done. It jackknifed me. It throwed me across to the side of my trailer.''

The foregoing was read to the Court and jury from the Discovery Deposition of Mr. Blackwell.

In the course of his examination at the trial, he was asked and answered:

''Q. What was the sensation, as you recall, as the unit careened down the highway? You say it jackknifed toward its final resting place. Was it making a noise?

A. It made a racket, I suppose, when the car hit. I heard a racket and then it just jackknifed.

Q. And then when you got out, you were able to get out, you had to get out on the right side?

A. That's right.

Q. And that's the first time that you ever knew of the other car, the car that—the Vaughns' car?

A. That's right.

Q. Now, your testimony that was read concerning the stopping, ordinary circumstances, stopping this unit, what distance can you stop if you apply the brakes?

A. Well, when I gave that deposition I said about fifty feet. Well, I was thinking in terms of yards instead of feet, and it should have been fifty yards. About a hundred and fifty feet to stop one.

Q. Well, if I recall your deposition, you described— you said the length of it and then some.

A. Yes, sir.''

There is evidence that the tractor-trailer was about forty-two feet long.

At another point, he was asked if he was not traveling as fast as the law would allow at the time of the accident and he said that he would not say that he was going as fast as the law would permit. He was then asked and answered:

''Q. Do you remember the officer saying he asked you at the scene and you said fifty? You don't deny that?

A. No, sir.

Q. So, if you were going fifty, you were going as fast as you were permitted by law to travel?

A. That's right.''

At another point, he testified:

"Q. You never saw the vehicle at all until it was seventy-five to a hundred feet away from you; that is correct, isn't it?

A. Yes, sir."

He was further questioned as to why he did not see the Allison car until it was within seventy-five or one hundred feet of him, and he answered that he just did not know. He then made the following significant statements:

". . . I don't know whether I saw the car and didn't realize seeing the car until he made a move towards me, or why that I didn't notice the car before it got that close to me.

Q. Just don't know why you didn't notice it?

A. But after he made the move, that attracted my attention when he came across the line.

Q. Then you never saw the Vaughn automobile at any time until your vehicle crashed into it, did you?

A. No, sir.

Q. And you didn't even know it then, did you?

A. No, sir.

Q. The first time you saw it is when you stepped on the hood?

A. That's right."

And, in conclusion of the cross-examination, he was asked and answered:

"Q. And you never attempted to apply your brakes at any time?

A. No, sir."

State Highway Patrolman, Gerald King, testified that he went to the scene of the accident shortly after it had occurred and before Mr. and Mrs. Vaughn and the children were removed by ambulance to the hospital. He testified about the position on the road of the vehicles involved, the width of the road, the length of the marks on the highway, and other matters concerning the accident. As to the cut marks on the pavement made by the rear axle of the trailer after the rear wheel was knocked loose by the impact of the Allison car, he stated that these cut marks were sixty-nine steps in length and that his steps averaged about two and one-half feet each, which would indicate that said marks were approximately $172\frac{1}{2}$ feet long. In reference to his conversation with Blackwell at the scene of the accident, he stated:

"To the best of my knowledge, this has been, like I say, a pretty good while ago, and I'll have to tell you the best I can on it. In talking to Mr. Blackwell, I asked him what had happened. He stated that he saw the vehicle in which Mr. Allison was driving coming towards him in a weaving manner, and he came over on his side of the road. Mr. Blackwell, in turn, went to the shoulder, the west side of the road on the shoulder, got his wheels as far over as he could get, and Mr. Allison

still proceeded to come straight at him and he cut the back wheels off the left side of his trailer.

Q. Now, you say that he saw the car, Allison car, coming towards him, weaving?

A. Right."

He also testified that Blackwell told him that he, Blackwell, was traveling approximately fifty miles an hour at the time of the accident.

The witness, Kenneth Johnson (not the defendant, L. Kenneth Johnson), testified that, at the scene of the accident, Blackwell told him: "He saw the Allison car coming, thought it was going to hit him headon, and he cut his tractor over to the right, to the shoulder of the road, and then this car hit him in the side."

## OUR CONCLUSIONS

We begin with the rule of law which has been stated in a number of our decisions and the decisions of the Supreme Court of Tennessee, but which rule has never been more clearly stated than in the case of Poole v. First Nat. Bank of Smyrna, 29 Tenn.App. 327, 336, 196 S.W.2d 563, 567, 568, where, in an Opinion by Judge Felts, it was said:

"The trial judge, and the appellate court on review, [are required in determining a motion for a directed verdict,] to look to all evidence, to take the strongest legitimate view of it in favor of the opponent of the motion, and to allow all reasonable inferences from it in his favor, to discard all countervailing evidence; and if then there is any dispute as to any material de-

terminative evidence, or any doubt as to the conclusion to be drawn from the whole evidence, the motion must be denied.''

In Tennessee Electric Power Co. v. Hanson, 18 Tenn. App. 542, 79 S.W.2d 818, the rule was stated as follows:

''The question of contributory negligence, as well as the question of negligence, is ordinarily for the jury. Even though the facts be undisputed, if intelligent minds might draw different conclusions as to whether, under the circumstances conceded, the conduct of a plaintiff was that of an ordinary prudent person, the matter should be left to the jury. The court should draw no inference when in doubt, but only in those cases where the evidence is without material conflict, and such that all reasonable men must reach the same conclusion therefrom. It is only in cases where the evidence is susceptible of no other fair inference that the court is justified in instructing the jury, as a matter of law . . .''

Considering the evidence in the case at bar, can it be said that all intelligent minds must draw the same conclusion, to-wit, that there was a complete absence of proximate negligence on the part of Blackwell in the operation of the tractor-trailer rig as he approached the scene of this accident and then crashed into the Vaughn car?

In the first place, when we consider the above question, we cannot ignore the fact that twelve jurors who heard all of the evidence, and, acting under proper instructions from the Court, found that the defendant, Blackwell, was

guilty of proximate negligence in this accident and returned their verdict accordingly. We must assume that these men were reasonable men, and, while their verdict is not conclusive, it is, at least, quite persuasive on the question of whether reasonable minds must agree as to Blackwell's negligence or the absence of it.

There is no question but that Allison, the driver of the Ford car, was guilty of proximate negligence and no question is made as to the fact that Mr. Vaughn, the driver of the Chevrolet automobile in which he and his family were riding, was free of negligence in this accident.

The record shows that from the slight hill to the south of the scene of the accident, Allison traveled some one thousand to twelve hundred feet in plain view of Blackwell, the driver of defendant's truck, before the impact with the tractor-trailer rig, and yet, according to Mr. Blackwell's testimony, he did not see the Allison car until it was within seventy-five or a hundred feet of his truck. Thus, certainly, for approximately one thousand feet before the impact, Blackwell could have seen Allison and when he did see the Allison car, it was weaving, according to his testimony, and it veered over toward the center of the road and an instant later, collided with the rear end of the trailer. Thereupon, Blackwell apparently lost control of the tractor-trailer rig. But it is significant that he testified that at no time did he apply the brakes nor did he take any action whatever toward avoiding collision with the Vaughn car. His only evasive action was to pull toward the right shoulder when he saw the Allison car approaching and pulling over toward his side of the road.

Another significant fact is that Blackwell testified that he never at any time saw the Vaughn automobile before his tractor ploughed into it and demolished it. Surely there is some question as to why he never saw it and as to whether he was actually keeping a proper lookout ahead in view of the fact that he did not consciously see the Allison car approaching until it was within seventy-five or a hundred feet of him and frankly stated:

". . . I don't know whether I saw the car and didn't realize seeing the car until he made a move towards me, or why that I didn't notice the car before it got that close to me."

It is significant that he never saw the Vaughn automobile at all, although, according to the evidence, it was in plain view. Why did he not see the Vaughn automobile when the Allison car passed it going at a rapid speed, and why did he not see it when Mr. Vaughn pulled over onto the right shoulder ten feet off of the pavement in order to try to avoid what looked like an imminent collision as the Allison car approached the tractor-trailer in such manner as that one of the children called out, stating: "That truck is going to hit that car," or words to that effect?

Under the facts and circumstances shown by this record, we are of opinion that there is evidence sufficient for submission to the jury of the question of negligence or want of negligence on the part of Blackwell, the driver of the tractor-trailer rig. Therefore, it was error for the Trial Judge to sustain the motion for a directed verdict.

It results that the assignment of error is sustained, the judgment of the Trial Court is reversed and the cause remanded for a new trial.

614

Reversed and remanded.

Puryear and Todd, JJ., concur.

ON PETITION TO REHEAR

SHRIVER, Judge.

The Petition to Rehear states:

"1. The appeal in this case was argued before this Court on May 20, 1971.

2. Appellants were pleased with this Court's Opinion filed July 30, 1971, which reversed the lower court's directed verdict.

3. Appellants seek rehearing, however, submitting that an order of this Honorable Court should instruct a reinstatement of the jury verdict and award of damages in lieu of the order of remand for new trial."

■ It is asserted that the Trial Judge in response to the motion of plaintiffs for a new trial stated that he was pleased with the amount of damages awarded by the jury but still felt that a directed verdict as to defendants, Lewisburg Transfer Company and the driver, Ralph J. Blackwell, was proper. It is urged, however, that inasmuch as the Judge expressed satisfaction with the amount of the award ". . . there is no logical need for a costly and time-consuming retrial."

It is further asserted in the Petition:

"... New thinking in the area of procedural reform supports this conclusion. Such new thinking obviously influenced new rule 50.02 of the 1971 Rules of Civil Procedure, which provides for reservation of ruling on a motion for directed verdict until after a jury verdict.

Because of the newness of Rule 50.02, no Tennessee case in point explains its rationale. Rule 50.02, however, is modeled after Rule 50(b) of the 1938 Federal Rules of Civil Procedure, upon which many noted authorities and Federal Courts have commented.

\*   \*   \*   \*   \*   \*

In the alternative, appellants submit that this Honorable Court could modify its order of remand by instructing the Trial Court to either order a new trial or, if it can now approve the jury verdict in favor of appellants, in light of the uncontradicted evidence of the appellee, Blackwell, and witnesses regarding the accident, and this Court's opinion, and the Trial Court's earlier expression of satisfaction with the amount of damages awarded in favor of appellants, reinstate the jury verdict as the judgment of the Trial Court."

In the Opinion of the Trial Judge, made a part of the record, his reasons for holding that the evidence was insufficient as a matter of law to support a verdict against Lewisburg Transfer Company and Blackwell are stated. Among other things, the Opinion states:

"We all know that Mr. and Mrs. Vaughn were not only innocent but fine people ... But this does not

permit us, on the evidence presented, to look Mr. Blackwell in the eye and say, 'Your negligence, Ralph Blackwell, killed James and Brenda Vaughn,' and this the Court cannot do."

For reasons stated in our Opinion filed July 30, 1971, this Court disagreed with the learned Trial Judge as to whether there was evidence to support a jury verdict, but we do not conceive that his subsequent expression of satisfaction with the amount of the award indicated such approval of the jury verdict as is necessary to enable us to restore it and affirm the judgment.

When we remember that, under our statutes and decisions, the Trial Judge is strictly limited to ninety days after judgment in which to consider and approve a Bill of Exceptions—presumably while the testimony is fresh in his memory—we think after a greater lapse of time, as in this case, it would not be right or proper to ask or direct this Judge to reconsider his firmly expressed disapprove of the jury's finding of facts and approve the same.

In Mize v. Skeen, 63 Tenn.App. 37, 468 S.W.2d 733, it was said:

"When the trial judge functions as a thirteenth juror, he is not only required to approve or disapprove of the verdict but is charged with independently weighing the evidence and determining therefrom whether the evidence preponderates in favor or against the jury verdict. England v. Burt, 23 Tenn. 399; McLaughlin v. Broyles, 36 Tenn.App. 391, 255 S.W.2d 1020 (see cases cited therein).

While we are impressed with the logic and force of the argument presented by counsel in support of the Petition, we feel we must deny the prayers thereof.

Petition denied.

Puryear and Todd, JJ., concur.